**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 3:25-CR-130 (KAD) |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE SMALL | : | April 21, 2026 |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 20)**

Kari A. Dooley, United States District Judge:

On August 7, 2025, a federal grand jury returned a one-count indictment against Defendant

Lawrence Small charging him with the Unlawful Possession of a Firearm by a Felon in violation

of Title 18 United States Code Section 922(g)(1) and 924(a)(8).  Indictment, ECF No. 1.  Pending

before the Court is Defendant's motion to suppress items seized from his vehicle on March 30,

2025.  Mot. to Suppress, ECF No. 20 at 1.  Defendant sought an evidentiary hearing, which the

Court convened on March 9, 2026 over the Government's opposition.  *See* Not., ECF No. 42; Opp.,

ECF No. 27 at 8–9.  The Government opposes the motion.  Opp., ECF No. 27.  For the reasons

that follow, the motion is DENIED.

**Factual Background**

The events of March 30, 2025, leading up to and culminating in the search of Defendant's

vehicle are largely agreed upon and, indeed, were mostly captured on body camera footage which

has been submitted to the Court.  On that date, officers of the Hartford Police Night Strike Unit

received information from Parole Officer Howlett that Defendant was wanted as a parole fugitive

and that a parole rearrest warrant has been issued.  Ex. A, ECF No. 22 at 4–5 (SEALED).[1]  Officer

---

[1] To the extent the Court cites to and reveals information previously sealed, those cited portions of the sealed matters
are simultaneously hereby unsealed, as necessary and important to the Court's deliberative and adjudicative process
in deciding this motion.  *See, e.g.*, *United States v. M/Y Amadea*, No. 23 Civ. 9304 (DEH), 2025 WL 754124, at *5

Howlett informed officers that Defendant was known to be in the area of Wethersfield Avenue in Hartford and that he has been driving a 2010 Infiniti G37 with the license plate ending in "546." *Id*. at 4 (SEALED).  Officer Howlett further informed officers that Defendant was known to possess firearms.  *Id*. (SEALED).

The Night Strike Unit determined to arrest Defendant based on the information provided by Officer Howlett.  Officers observed the Infiniti with the license plate number BT58546 parked outside 370 Wethersfield Avenue in Hartford.  *Id*. (SEALED).  The officers set up surveillance shortly after midnight and at 12:45 am, officers observed an individual exiting an apartment and approaching the Infiniti.  *Id*. (SEALED).  Defendant entered the vehicle, at which time officers activated their emergency lights and surrounded the vehicle.  *Id*. (SEALED).

One officer alleged to have seen Defendant "lean forward and make frantic, stuffing movements," which Defendant argues is inconsistent with the body camera footage.[2]  Mot. to Suppress, ECF No. 20-1 at 2; Ex. A, ECF No. 22 at 4 (SEALED); Exs. B–C, ECF Nos. 20-2–20-3.  Officers repeatedly told Defendant to exit the vehicle, but he did not comply.  Ex. A, ECF No. 27-1.  Officers broke Defendant's window and the vehicle began to roll in reverse.  *Id*.  Officers forcibly removed Defendant from the vehicle and Defendant was immediately handcuffed.  *Id*.

One of the arresting officers, Officer Justin Nelson, was a K-9 handler who conducted a search of the exterior of the vehicle with his narcotics dog, K-9 Axel.  Ex. F, ECF No. 52.  Axel alerted to the presence of narcotics, which prompted Officer Nelson to inform the other officers there was a positive alert; a search of the vehicle ensued.  *Id*.  The search revealed a pistol with a

---

n.6 (S.D.N.Y. Mar. 10, 2025) (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140–42 (2d. Cir. 2004); *Eagle Star Ins. Co. v. Arrowood Indem. Co.*, No. 13 Civ. 3410, 2013 WL 5322573, at *1 (S.D.N.Y. Sept. 23, 2013)).

[2] The Officer approaching the vehicle from the front and on the driver's side had his weapon drawn and pointed at the vehicle, thereby obstructing the camera's view of the Defendant in the vehicle.  *See* Ex. B, ECF No. 20-1.

high capacity magazine under the passenger-side seat.  Ex. A, ECF No. 22 at 4–5 (SEALED).  The officers did not find any narcotics.  *Id*.

Officers placed Defendant in a patrol vehicle and read him his Miranda rights.  Defendant requested an attorney and made additional comments regarding his arrest.[3]  Ex. E, ECF No. 52.

**Standard of Review**

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S. Const. amend. IV).  "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"  *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  "In most cases, reasonableness requires a warrant and probable cause."  *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004) (citation omitted).  Indeed, the Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

*Automobile Exception*

Searches conducted without a warrant are "'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "Once a defendant with a reasonable expectation of privacy in the area searched challenges a warrantless search as unreasonable under the Fourth Amendment, the burden is on the government to demonstrate that the search was within one of the recognized exceptions."

---

[3] The government does not intend to rely on Defendant's post-arrest statements so long as Defendant does not put them at issue.  Opp., ECF No. 27 at 8.

3

*United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 330 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 F. App'x 441 (2d Cir. 2011).

Relevant here, the "automobile exception" allows police to "conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (citations omitted). The Supreme Court has articulated two "distinct theories" that underpin this exception: first, that individuals have a lower expectation of privacy in their vehicles than in their homes, and second, that the inherent mobility of vehicles creates an exigency for law enforcement. *See United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007); *Navas*, 597 F.3d at 497–98. The permissible scope for a search under the automobile exception "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). Therefore, if the probable cause justifying a search includes the entire vehicle, "the permissible scope of the search pursuant to this exception includes every part of the vehicle and its contents including all containers and packages that may conceal the object of the search." *United States v. Wilson*, 699 F.3d 235, 246 (2d Cir. 2012) (internal quotations and citations omitted).

*Probable Cause*

"[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Although the probable cause standard "does not demand 'hard certainties,' . . . it does require more than a 'hunch.'" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 231; *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968)). Probable cause exists when "there is a fair probability that contraband or evidence of a

crime will be found in a particular place." *Gates*, 462 U.S. at 238. Probable cause is assessed based upon the totality of the circumstances and may be found where a law enforcement official "has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Howard*, 489 F.3d at 491 (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir.2006)). "[P]robable cause is a flexible, common-sense standard . . . [and] the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation and internal quotation marks omitted).

**Discussion**

The motion to suppress therefore turns on the question of whether, under the totality of the circumstances, there was probable cause to search Defendant's vehicle.

Defendant first argues that the officers violated the Fourth Amendment when they searched the vehicle *before* K-9 Axel alerted to the presence of narcotics.[4] Additional facts are needed to address Defendant's first argument.

After Defendant was removed from the vehicle and placed under arrest, the body camera footage shows police officers entering the vehicle on two separate occasions. One officer opened the driver's door, reached in and appears to have put the vehicle in park. Ex. E, ECF No. 52. A second officer opened the back door and used his flashlight to briefly search the interior of the car. *Id*.; Tr., ECF No 53 at 40. The officers did not see any contraband or remove anything from the

---

[4] Defendant also asserts that the police purposefully waited until he entered his vehicle before activating their lights and boxing the vehicle in. Mot. to Suppress, ECF No. 20-1 at 7. He asserts that they could have and should have arrested him before he entered the vehicle. *Id*. Defendant cites no authority for such a novel proposition. It is unclear where such an "arrest on sight" requirement might be found in our Constitution and adopting such a rule would surely increase the danger to police officers effecting arrests. The Court does not further address this argument.

car following this use of flashlights on the interior of the vehicle.  The Defendant argues that these searches were not supported by probable cause.

The Government first responds that these two "searches," even if fairly characterized as such, did not result in the seizure of any items and therefore there is nothing to suppress.  The Court agrees.  "To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of *improperly obtained evidence* at trial.'" *United States v. Gomez*, 877 F.3d 76, 93 (2d Cir. 2017) (citation omitted) (emphasis added).  "Suppression is 'our last resort, not our first impulse.'" *Id*. (citation omitted) (cleaned up).  It is axiomatic that there is no need for an "exclusionary rule" if there is no evidence to exclude.  *See Hudson v. Michigan*, 547 U.S. 586, 592–93 (2006) (discussing the necessary relationship between the constitutional violation alleged and the evidence sought to be excluded.).  Nor has Defendant advanced any argument that these searches in any fashion led to the use of K-9 Axel or the subsequent search that resulted in the seizure of the firearm.  As a result, there is no evidence to suppress arising from the initial search of the interior of the vehicle with flashlights.

As discussed, *infra*, the firearm was found and seized only as a result of the search which followed K-9 Axel's alert.  Thus, the question to be decided is whether the K-9 alert, coupled with the other pre-search events, provided probable cause for the search.[5]

*The Alert*

After Defendant was removed from the vehicle, Officer Nelson and K-9 Axel, conducted a narcotics sniff of the exterior of the vehicle.  Ex. A, ECF No. 22 at 5 (SEALED); Ex. C, ECF

---

[5] Alternatively, the Government argues that separate and apart from the K-9 alert, there existed probable cause to search Defendant's vehicle because of the rearrest warrant, the knowledge that defendant was known to possess firearms, the alleged "frantic stuffing movements" that Defendant had made when police approached his vehicle, failure to raise his hands per police command, and moving the vehicle in reverse. *See* Opp., ECF No. 27 at 1; Ex. A, ECF No. 22 (SEALED).  For purposes of the Motion to Suppress, for the reasons discussed herein, the Court need not decide this issue.

No. 20-3.  Axel alerted to the presence of narcotics, at which point Officer Nelson informed the other officers and a search of the vehicle ensued.  Ex. C, ECF No. 20-3; Ex. F, ECF No. 52.  That search resulted in officers seizing a Smith & Wesson model SD9VE, 9mm caliber handgun.  Ex. A, ECF No. 22 at 5 (SEALED).  The Court concludes the search and seizure were proper because Axel's alert to the presence of narcotics established probable cause.  *See* Ex. C, ECF No. 20-3; Ex. F, ECF No. 52.

"Probable cause exists where the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched."  *Gaskin*, 364 F.3d at 456 (cleaned up) (citations omitted).  A positive alert from a narcotics dog can be sufficient on its own to support a finding of probable cause when there is evidence of the dog's satisfactory performance in certification or training.  *See United States v. Manson*, No. 3:22-cr-211 (JAM), 2023 WL 5096021, at *3 (D. Conn. Aug. 9, 2023) (citing *Fla. v. Harris*, 568 U.S. 237, 246–47 (2013); *United States v. McKenzie*, 13 F.4th 223, 237 (2d Cir. 2021)).  Indeed, the Government presented the testimony of Officer Nelson regarding Axel's training and reliability during the motion hearing convened on March 9, 2026, and Defendant had the opportunity to cross-examine Officer Nelson.  *See* Tr., ECF No. 53 at 43–78.

At the hearing, Officer Nelson testified regarding the training that both he and Axel completed to be certified as a narcotics dog and handler.  *Id*. at 43–62.  Officer Nelson and Axel graduated from their initial training in 2019, which included obedience, apprehension, tracking, building searches, and evidence recovery.  *Id*. at 44.  In 2022, they underwent additional narcotics training.  *Id*.  Officer Nelson and Axel received their certification to detect methamphetamine,

heroin, and cocaine from The National Narcotic Detector Dog Association (NNDDA). *Id*.; Ex. C, ECF No. 27-3. The certification procedure was pass/fail. *See* Tr., ECF No. 53 at 44.

During the certification process, Officer Nelson and Axel would enter different rooms, some blank, meaning they contained no narcotics, others containing narcotics. *Id*. at 47–48. The presence (or not) of narcotics is unknown to both the K-9 and the handler at the time of evaluation. *Id*. at 46. If Axel had alerted to the presence of narcotics in any blank room, he would have failed the training and not been certified. *Id*. The evaluations take place in a variety of spaces, including buildings, offices, and cars. *Id*. at 46–47. Axel has been continuously certified for narcotics detection from the time of his certification in 2022 through the search of Defendant's vehicle. *Id*. at 46.

As part of the certification process, Officer Nelson learned to interpret Axel's behavior. *Id*. at 49. As a result, Officer Nelson is aware of the behaviors that Axel exhibits when he detects narcotics before he gives a final alert. Before taking Axel over to the vehicle, Officer Nelson retrieves Axel's collar, which Axel associates with narcotics detection, and a Kong toy that is Axel's reward for a positive alert. *Id*. at 53–54; Ex. F, ECF No. 52. Officer Nelson will tell Axel to heel, which requires him to walk alongside Officer Nelson to the vehicle. Officer Nelson tells him to sit, and then he says, "find your gift," which indicates to Axel to search for the scent of narcotics. Tr., ECF No. 53 at 54–55; Ex. F, ECF No. 52.

When Axel is conducting a narcotics search, he will circle the vehicle twice. If Axel does not alert on the first pass, then Officer Nelson will direct Axel to search each seam of the vehicle. Tr., ECF No. 53 at 55. If Axel does not alert after the second pass, Officer Nelson would inform the other officers that there were no narcotics detected. *Id*. In the present matter, Officer Nelson observed Axel offering indicators that he detected the presence of narcotics during the first pass

of the vehicle. *Id*. at 56. Axel's indicators include that he head hooks and then does a big inhale and exhale. *Id*. at 56–58. The final response to alert to the presence of narcotics is to sit down and stare in the direction of the narcotics. *Id*. at 58.

As can be seen in the bodycam footage, Axel, indeed exhibited these behaviors and then alerted to the presence of narcotics. Ex. C, ECF No. 20-3; Ex. F, ECF No. 52. He approached the passenger side door, head hooked left, took a big inhale and exhale, and then sat down on the curb, albeit briefly, staring at the car door. Ex. C, ECF No. 20-3; Ex. F, ECF No. 52. At that point, Officer Nelson informed the other officers that there had been a positive alert and they began to search the car, which resulted in the recovery of the firearm at issue. *See* Ex. C, ECF No. 20-3; Ex. F, ECF No. 52.

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Harris*, 568 U.S. at 246–47. Based on the record evidence, Axel's alert to the presence of narcotics in the vehicle established probable cause to search the vehicle. *Id*.; *see also* Tr., ECF No. 53 at 43–62; Ex. C, ECF No. 27-3.

Defendant's argument to the contrary notwithstanding, the fact that narcotics were not found in the vehicle following Axel's alert does not negate Axel's reliability nor the finding of probable cause. "[I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person." *Harris*, 568 U.S at 245–46.

9

Indeed, as Officer Nelson acknowledged, there have been circumstances where Axel alerted to the presence of narcotics, as here, and none were found. Defendant ably cross-examined Officer Nelson on this issue. *See* Tr., ECF No. 53 at 67–74. As the Supreme Court recognized, there are a number of reasons that Axel, or any narcotics-sniffing dog, could reliably alert but police officers might not recover narcotics from the site, *see*, *e.g.*, *Harris*, 568 U.S at 245–46, and the Court need not speculate as to why narcotics were not recovered in this particular instance.

> *Totality of the Circumstances*

As discusses, *supra*, Axel's alert to the presence of narcotics was sufficient on its own to establish probable cause to search the vehicle. *Harris*, 568 U.S at 246–47. But the combination of the alert with the other circumstances present — the parole rearrest warrant, Officer Howlett's report that Defendant was known to possess firearms, the alleged stuffing motion that Defendant made, the car rolling backwards, and Defendant's failure to respond to commands from officers, — removes any question as to whether the officers had probable cause for the search. *See United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) ("it is generally understood that probable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." (internal quotation marks and citation omitted)). Accordingly, there is no basis to suppress the firearm that was seized as a result of the search.

**Conclusion**

For all of the foregoing reasons, the Motion to Suppress, ECF No. 20, is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of April 2026.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

10